# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**WILLIAM JOHNSON, JR.,**

      **Petitioner,**

   **v.**

**WARDEN, CHILLICOTHE**
**CORRECTIONAL INSTIUTION**

      **Respondent.**

**CASE NO. 2:17-CV-0055**
**Chief Judge Edmund A. Sargus, Jr.**
**Magistrate Judge Kimberly A. Jolson**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Return of Writ, Petitioner's Traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## I. FACTS AND PROCEDURAL HISTORY

The State appellate court summarized the facts and procedural history of the case as follows:

> {¶ 3} At a jury trial commencing May 5, 2014, the state presented the testimony of K.J., the victim, who was 14 years old at the time of trial. K.J. testified that the first time her father sexually abused her, she was 11 years old. K.J. said she, her brother, and her sister were still asleep on an air mattress in their father's bedroom early in the morning when her father woke her up and told her she could get in the bed with him. She said she "didn't think anything of it," so she got into bed with W.J. [Petitioner], and that is when he started to touch her inappropriately. (Tr. Vol.II, 67.) Specifically, K.J. said her father "started to touch [her] butt, and he just kept on [her] legs and thighs." (Tr. Vol.II, 69.) K.J. said she asked W.J. what he was doing and he said, "[n]othing," and that was the end of it for the first day. (Tr. Vol.II, 69.)

> {¶ 4} As time passed, K.J. said her father's behavior toward her escalated. She testified that W.J. would put his penis near her and touch portions of her lower body with it. Eventually, her father moved into another apartment and K.J. had a

bedroom separate from her father's that she shared with her brother and sister. K.J. said her father would come into her bedroom with no pants on and say "I got something to show you," to "prepare [her] to be better in life." (Tr. Vol.II, 71.) K.J. testified that W.J. would then show her his penis, remove K.J.'s pants and undergarments, and put his penis inside her vagina. The first time he vaginally penetrated her, K.J. said there was a lot of pressure, it hurt, and she experienced vaginal bleeding. K.J. said she was 11 years old at the time of this incident. K.J. did not know how many times in total her father had put his penis in her vagina because "it went on for more than a year," saying he repeated this behavior "the whole time that I was in Ohio up until" W.J.'s arrest on September 6, 2013. (Tr. Vol.II, 73–74.)

{¶ 5} K.J. testified that aside from the vaginal penetration, W.J. would also put his penis in her mouth. She said her father would tell her he was teaching her a lesson "so that [she] would know what to do when [she] got older." (Tr. Vol.II, 74.) The first time W.J. put his penis in her mouth, K.J. said she was 11 years old. K.J. said this was a separate incident from the first time he put his penis in her vagina. K.J. testified that there were repeated instances of W.J. putting his penis either in her vagina or in her mouth when she was both 12 and 13 years old.

{¶ 6} K.J. then described what happened on September 6, 2013, the day her father was arrested. K.J. said her father suggested she accompany him in his car to a pet supply store to buy a new leash and collar for the family dog. Instead of going to the pet store, however, K.J. said W.J. called T.G., his former girlfriend, and drove to pick her up. Before picking up T.G., W.J. stopped at a convenience store and purchased some alcohol. K.J. said she had been sitting in the front passenger seat, but once they picked up T.G., K.J. moved to the second row of seats. W.J. then drove the three of them to a park on Broad Street. While they were driving around, K.J. said her father and T.G. were drinking the alcohol and talking about money, and that T.G. asked W.J. how much he was going to pay her.

{¶ 7} When they arrived at the park, K.J. said W.J. drove to the back of the park and parked the car with the tail end up against some cement cylinders. K.J. said her father instructed her to take her pants off but she told him she did not want to. At that point, T.G. went into the back seat with K.J., removed K.J.'s pants, and W.J. told T.G. to put her mouth on K.J.'s vagina. T.G. did as instructed, and K.J. said her father watched and instructed T.G. to continue performing cunnilingus on K.J. After that, K.J. said her father put the steering wheel up high and reclined his seat, then told K.J. to sit on top of his penis. K.J. told him she did not want to, but W.J. grabbed her arm and tugged her towards him while T.G. pushed K.J. toward

W.J. W.J. then put his penis inside K.J.'s vagina even though she told him she did not want to do it, and he "just ignored [her] and just continued." (Tr. Vol.II, 87.) While this occurred, K.J. said T.G. was sitting on the side "talking crazy, was, like 'Do it to her' kind of stuff." (Tr. Vol.II, 87.) Eventually, K.J. said her father pushed her off of him, told her to go to the back seat, laid her on her back, and put his penis inside her vagina again. K.J. testified that W.J. ejaculated on the seat, told K.J. to put her pants on, and then drove T.G. back to where he had initially picked her up.

{¶ 8} After dropping off T.G., K.J. said W.J. drove back to the same convenience store and purchased more alcohol. The two drove around for a while before returning home because K.J.'s mother kept calling looking for them. When they got back to their apartment, W.J. parked the car but did not go inside the apartment. W.J. again had K.J. "get on top of his penis" while they were in the parked car outside the apartment, and he again put his penis inside her vagina. (Tr. Vol.II, 93.) While they were inside the car, K.J.'s brother came out of the apartment and saw her in the car with W.J., causing W.J. to push K.J. to the back and scream at K.J.'s brother and his friends to go away. K.J. told her brother to go get her mother. K.J. said her mother then called the police.

{¶ 9} When the police arrived, K.J. testified she told the police what happened because she "finally had proof of what he had done, and [she] knew it would all be over and [she] wouldn't have to keep hiding it." (Tr. Vol.II, 96.) K.J. then went to Nationwide Children's Hospital to be evaluated. K.J. said a nurse swabbed her vagina and her mouth and performed an internal examination, and a social worker came to speak with her about what had happened.

{¶ 10} K.J. said she had not told anyone about the abuse before because W.J. would buy her things and tell her that if she told anyone, he would not buy things for her anymore. K.J. said W.J. bought her a phone and other things she wanted like clothes and shoes, and that he generally "just did more for [her] than he did for the rest of the kids." (Tr. Vol.II, 97.) K.J. said she would always tell W.J. she did not want to do whatever sexual thing he was demanding, but that he would do them anyway. She also said that she would threaten to tell her mom what was happening but that W.J. would tell her that her mother would not believe her. K.J. said she never told a teacher about what was happening because she did not want children's services to get involved and have her family split up. K.J. said she was afraid of being called a liar and she was ashamed.

{¶ 11} Additionally, K.J. said she was embarrassed because she had once become pregnant when she was 12 years old as a result of sexual intercourse with her father and she had an abortion. When W.J. found out K.J. was pregnant, he made her tell her mother because her mother was K.J.'s legal guardian and was the one who would have to sign the consent for her to get an abortion. K.J. said her father told her mother that K.J. had had sex with some boy, which was not true.

{¶ 12} When W.J. wanted to be alone with K.J., K.J. said her father would send her siblings to the store or to run an errand "so no one would catch him in the act." (Tr. Vol.II, 72.) K.J. said no one else ever knew about her father's abuse because he would only initiate things when her mother and siblings were asleep or out of the house.

{¶ 13} On cross-examination, K.J. said her father would occasionally "threaten to whoop [her]" if she did not perform the sexual act he requested. (Tr. Vol.II, 142.) She said that he actually did whip or hit her "[a] couple of times" for saying no to sex, and that he would withhold stuff or take stuff away. (Tr. Vol.II, 142.) K.J. said W.J. would sometimes show her videos of T.G. performing oral sex on him, and K.J. told someone from children's services about those videos after W.J.'s arrest.

{¶ 14} K.J.'s brother, I.J., who was 13 years old at the time of trial, testified that on the day his father was arrested, W.J. took K.J. to go get a leash and collar for their dog, but the two of them were gone for three or four hours. I.J. said he was outside with some friends when he saw his father's car pull up in front of the apartment. When he ran up to the car, I.J. said he saw his father sitting in the front seat in his underwear and K.J. was in the back seat. I.J. said that when K.J. saw him there, she told him to go get their mother. I.J. sent his sister M.J. to go get their mother, and he stood by the car while W.J. was telling everyone to leave. On cross-examination, I.J. said he never saw anything inappropriate happen between his father and K.J. prior to the day of his father's arrest, but he noticed that W.J. would buy a lot of gifts for K.J.

{¶ 15} M.N., K.J.'s mother, testified that she never had any indication that W.J. was abusing K.J. in any way. M.N. further stated that K.J. never disclosed anything to her about the abuse. When asked about K.J. having an abortion, M.N. said that K.J. told her she became pregnant after having sex with a boy who lived down the street. A few weeks prior to W.J.'s arrest, M.N. said she took all five of her kids to Georgia for about four days, and, that while they were there, K.J. told her she was glad they left but that K.J. would not elaborate as to what that meant.

M.N. said none of her other children ever came to her with any concerns that K.J. was being abused.

{¶ 16} Kelli Skaggs, a social worker at Nationwide Children's Hospital emergency department, testified she met with K.J. during the early morning hours of September 7, 2013 when Detective Jay Shockey of the Columbus Division of Police brought K.J. in for treatment. Skaggs said K.J. told her that she performed oral sex on W.J. and that T.G. performed oral sex on K.J. Skaggs further stated that K.J. disclosed vaginal intercourse between K.J. and W.J. Skaggs said K.J. told her about two instances of vaginal intercourse occurring on the same evening: once in the back seat of the car while it was parked at a park, and again in the parked car when they returned to the apartment complex. K.J. then told Skaggs that "things like this have been happening for the past three years." (Tr. Vol.II, 245.) Skaggs asked her for more specific information, and she said K.J. told her that for the past three years, W.J. has been making her perform oral sex on him and he has put his penis inside her vagina. K.J. further told Skaggs that she once became pregnant as a result of the sexual intercourse with W.J. and "forcibly had an abortion." (Tr. Vol.II, 245.)

{¶ 17} When asked about her experience interviewing child victims of sexual abuse, Skaggs said it is "not normal for kids to disclose every time" they are abused. (Tr. Vol.II, 248.) She said the reasons child victims do not always disclose their abuse range from "immediate trauma to fear," to "the way that they process" what happened to them. (Tr. Vol.II, 248.) Additionally, Skaggs said she does not expect child victims to disclose abuse in the same way every time, but that it is more common for them to give different details each time they describe the abuse. Following her interview with K.J., Skaggs said she passed along the information she had gathered to the medical providers who would be treating K.J. in order to help them craft an appropriate treatment for K.J.

{¶ 18} Lindsay Eckles Hoffman, a sexual assault nurse in the emergency department at Nationwide Children's Hospital, testified that she examined K.J. during the early morning hours of September 7, 2013. Relying on both the history provided to her by Skaggs and K.J.'s responses to questions, Eckles Hoffman performed a complete examination of K.J. Eckles Hoffman did not observe any bodily injuries to areas other than the genitals, but she observed redness and bleeding on K.J.'s vagina, indicating an acute trauma, and "notches" in K.J.'s hymen indicating trauma that had already healed. (Tr. Vol.II, 269.) Eckles Hoffman also said she swabbed various parts of K.J.'s body, including vaginal swabs, rectal swabs, oral swabs, cut hair standards, and fingernail scrapings.

Eckles Hoffman collected K.J.'s clothing that she was wearing, as well. Additionally, Eckles Hoffman took photographs of K.J.'s vaginal area and drew a blood sample to perform testing for sexually transmitted infections.

{¶ 19} Another sexual assault nurse examiner from Nationwide Children's Hospital, Gail Hornor, also testified. Hornor did not actually examine K.J. in person, but she reviewed Eckles Hoffman's documentation of the exam. Hornor said the documentation suggested an acute injury, meaning it occurred within the last 72 hours. Hornor said the injuries to K.J.'s hymen represented older injuries that heal with time, and the number of "notches" suggested K.J. could have been penetrated more than five times. (Tr. Vol.III, 354.) The older injuries documented on K.J. were at least three weeks old, but there was no way for Hornor to know exactly how old they were. Hornor testified that K.J. had a follow-up examination and it revealed that K.J. had the sexually transmitted infection trichomoniasis. Hornor said it is possible for a person infected with trichomoniasis to have the infection for months and not know about it. Hornor said the observation of both old and new injuries on K.J. was consistent with the history K.J. provided at the hospital about both past and recent sexual abuse.

{¶ 20} T.G., W.J.'s former girlfriend, then testified. T.G. said she had already pleaded guilty and been sentenced on one count of unlawful sexual conduct with a minor and one count of disseminating matter harmful to a juvenile. T.G. testified she met W.J. in 2008 and the two of them were in a relationship for about four years. She admitted she has had "dozens" of convictions for drugs and prostitution in her life. (Tr. Vol.III, 305.) After her relationship with W.J. ended, T.G. said she got back into prostitution in order to earn a living.

{¶ 21} On the day of September 6, 2013, T.G. said W.J. called her and she wanted to meet up with him to get money from him so that she could buy a rock of crack cocaine. When W.J. picked her up, T.G. said K.J. was in the car with him. T.G. testified W.J. gave her $15 and then instructed T.G. to perform oral sex on K.J. T.G. said she did as she was instructed, then she watched as K.J. and W.J. had sex in two different positions. When asked why she did not refuse when W.J. told her to perform oral sex on K.J., T.G. said she cooperated because she needed the money. T.G. agreed that when the police first contacted her after this incident, she denied ever being with W.J. and K.J. T.G. testified that there had been a previous incident when W.J. brought K.J. to T.G.'s apartment and asked if T.G. would allow K.J. to watch as T.G. and W.J. had sex.

{¶ 22} Detective Tim Elkins of the Columbus Division of Police's special victim's bureau sexual assault unit testified that he investigated the sexual assault of K.J. on September 6, 2013. Detective Elkins testified he responded to a call from patrol about K.J., and he responded to Brent Boulevard along with Detective Shockey. Upon arriving at the scene, Detective Elkins said he saw W.J. in the back of a patrol car, and he and Detective Shockey then spoke with K.J., her mother, and her brother, and they examined the vehicle where the offense occurred. Because K.J. indicated the offense occurred in the car, Detective Shockey impounded the car and sent it to the police department's impound lot where it would be held in a secure facility. After conducting interviews at the scene, Detectives Elkins and Shockey drove K.J. and her mother to Nationwide Children's Hospital in order to have the medical staff perform a rape kit on K.J.

{¶ 23} As they were driving, Detective Elkins said K.J.'s mother saw a woman outside and said, "[t]here's [T.G.] right there," so they pulled over to talk to T.G. even though they were not expecting to see her. (Tr. Vol.III, 381.) Detectives Elkins and Shockey parked the car and walked over to T.G. so that she would not be too close to K.J. or M.N. After speaking with T.G., the detectives placed her under arrest and called for a patrol car to take her to police headquarters. The detectives then dropped K.J. and her mother off at the hospital and returned to police headquarters to interview T.G. and W.J. Detective Elkins executed a search warrant to obtain samples of W.J.'s DNA as well as to swab his penis to test for the presence of anyone else's DNA on him. The crime scene search unit executed a second search warrant on W.J.'s car to look for DNA evidence there.

{¶ 24} Patrick Crawford, a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation ("BCI"), testified that he processed K.J.'s rape kit and that he identified semen on both K.J.'s vaginal and anal swabs. Crawford said K.J.'s skin swabs also tested positive for semen and amylase. Another forensic scientist at BCI, Andrea Weisenburger, testified that she analyzed the DNA samples collected from W.J. and that those samples matched the DNA found in K.J.'s rape kit. Weisenburger further testified that she analyzed the DNA sample collected from T.G., and that a test of K.J.'s underwear revealed the presence of DNA that did not belong to either K.J. or W.J., but the sample was not sufficient to determine to whom the third person's DNA belonged. Additionally, Weisenberger said that penile swabs collected from W.J. revealed a mixture of DNA consistent with both W.J. and K.J.

{¶ 25} At the close of the state's evidence, W.J. moved for a Crim.R. 29 motion for acquittal, and the trial court granted that motion only with respect to Count 5

of the indictment, disseminating matter harmful to a juvenile. The trial court denied the Crim.R. 29 motion with respect to the remaining charges.

{¶ 26} W.J. testified in his own defense. W.J. denied ever raping K.J. before September 6, 2013. However, W.J. admitted having sex with K.J. on September 6, 2013, but he blamed his actions on drinking and suggested his drink may have been spiked with some kind of drug. W.J. said he saw T.G. perform oral sex on K.J. and then he had vaginal intercourse with his daughter, but he did not implicate himself in ordering T.G. to assault K.J. W.J. denied having sex with K.J. in the car again once he drove back to their apartment.

{¶ 27} On cross-examination, W.J. said that when I.J. came to the car outside the apartment complex, I.J. misinterpreted what he saw. W.J. suggested K.J. had concocted the story about the prior incidents of sexual assault because his children did not want W.J. to be in a relationship with T.G.

{¶ 28} Brittany Valentine, a social worker with Franklin County Children Services, testified that she dealt with the W.J. family in January 2012 to determine why the children were not enrolled in school. During her time working with the family, neither K.J. nor anyone else reported any concerns of sexual abuse to Valentine.

{¶ 29} Following deliberations, the jury returned guilty verdicts to five counts of rape, one count of unlawful sexual conduct with a minor, and two counts of sexual battery. Three of the rape counts for which the jury returned guilty verdicts specifically referenced the fact that K.J. was less than 13 years old when the rape occurred. The other two rape counts for which the jury returned guilty verdicts referred to the events of September 6, 2013. The jury returned a not guilty verdict to Count 2 of the indictment, rape alleged to have occurred when K.J. was 11 years old. At a May 9, 2014 sentencing hearing, the trial court determined, for the purposes of sentencing, Counts 7 and 8, rape and sexual battery, should merge, and that Counts 9 and 10, rape and sexual battery, should merge. The trial court sentenced W.J. to an aggregate prison term of 25 years to life, and it journalized W.J.'s convictions and sentence in a May 14, 2014 judgment entry. W.J. Timely appeal[ed].

## II. Assignments of Error
{¶ 30} Through his counsel, W.J. assign[ed] the following two errors for [the state appellate court's] review:

[1.] The trial court violated [W.J.'s] rights to due process and a fair trial when it entered a judgment of guilt against him, when that finding was not supported by sufficient evidence. Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

[2] The trial court violated [W.J.'s] rights to due process and a fair trial when it entered a judgment of guilt against him, when that finding was against the manifest weight of the evidence. Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

{¶ 31} In addition to the merit brief prepared by counsel, W.J. also filed a pro se brief, assigning the following four errors for [the state appellate court's] review:

[1.] The trial court abused its discretion in not granting a mistrial after the court's witness violated the defendant's confrontation clause of the Sixth Amendment to the United States Constitution.

[2.] The trial court abused its discretion in not granting the jury the opportunity to review the transcripts of the victim and in not allowing the defendant to have an opportunity to object to the court's denial of allowing the jury to review the transcripts thereby causing a manifest miscarriage of justice and plain error.

[3.] The trial court abused its discretion in not granting a mistrial after the defendant was prejudiced by the state's witness introducing evidence of prior bad acts which exposed the jury to criminal patterns of the defendant thereby violating the defendant's right to trial Six Amendment to the United States Constitution.

[4.] The cumulative errors which took place during the defendant's trial deprived the defendant of a constitutional fair trial.

(Doc. 8-1, Ex. 18, *State v. W.J.*, 2015-Ohio-2353, ¶¶ 3-29, 2015 WL 3757469). On June 11, 2015, the appellate court affirmed the judgment of the trial court. (*Id.*). On October 28, 2015, the Ohio Supreme Court declined jurisdiction to accept the appeal. (*Id.*, Ex. 21, *State v. W.J.*, 143 Ohio St. 3d 1501, 39 N.E.3d 1271 (Table), 2015-Ohio-4468).

On August 20, 2015, Petitioner filed an application to reopen his appeal pursuant to App. R. 26(B). (*Id.*, Ex. 22). Petitioner claimed that he received ineffective assistance of appellate

counsel, because counsel failed to raise two issues: (1) that trial counsel erred when he did not provide or subpoena witnesses to contradict the victim's testimony and (2) that the trial court violated Petitioner's rights to due process and a fair trial when it entered a judgment of guilt against him, when the finding was against the manifest weight of the evidence. (*Id.*, Ex. 22). The Court denied the application to reopen on December 3, 2015. (*Id.*, Ex. 24).

On September 30, 2015, Petitioner filed a petition to vacate his conviction or sentence with the Franklin County Court of Common Pleas and requested an evidentiary hearing on September 30, 2015. (*Id.*, Ex. 25). The docket does not indicate that the trial court reached a decision on Petitioner's post-conviction petition, but the assignments of error in the petition were answered on direct appeal. Further, the docket indicates the case is closed. Therefore, there is nothing new in Petitioner's post-conviction petition that remains undecided.

Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on January 18, 2017. (Doc. 1). He asserts that the trial court improperly overruled objections and admitted into evidence an incriminating statement he made to police while he was intoxicated (claim one); that the trial court improperly entered judgment of guilt against him on three counts that contained a life imprisonment sentence when the finding was based on insufficient evidence (claim two); that he was denied effective assistance of counsel via his appellate counsel in a variety of ways (claim three); that the trial court abused its discretion in not granting a mistrial after evidence of prior bad acts were introduced that unfairly prejudiced Petitioner (claim four); and the trial court abused its discretion in not granting a mistrial after Petitioner was denied the chance to confront a witness in violation of the confrontation clause (claim five). (*See generally id.*).

## II.    DISCUSSION

Respondent argues that Petitioner's claims lack merit or are procedurally defaulted. (*See generally* Doc. 8).

### A.  Procedural Default (Claims One and Three)

#### 1. Standard

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus.  28 U.S.C. § 2254(a).  In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims must first present those claims to the state courts for consideration.  28 U.S.C. § 2254(b), (c).  If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies.  *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).  However, where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas[.]"  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), *abrogated on different grounds by Martinez v. Ryan*, 566 U.S. 1 (2012).  In other words, "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case.  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test.  *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986);

*see also Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*).  First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.  Second, the court must determine whether the state courts actually enforced the state procedural sanction.  Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.  *Maupin*, 785 F.2d at 138.  Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes:  (1) cause sufficient to excuse the default and (2) that he was actually prejudiced by the alleged constitutional error.  *Id.*

If, after considering all four factors of the *Maupin* test, a court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent."  *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)).

### 2. Application

In claim one, Petitioner asserts that the trial court improperly overruled objections and admitted into evidence an incriminating statement he made to police while he was intoxicated. (Doc. 1 at 7).  Respondent argues, and Petitioner admits in his Petition, that he did not raise this claim on direct appeal.  (*Id.*)

In claim three, Plaintiff alleges ineffective assistance of counsel on five grounds:

1.) Appellate counsel was ineffective for having failed to file an addendum merit brief on behalf of Petitioner, after being informed in writing that specific issues were required to be addressed.

2.) Appellate counsel was ineffective for failing to raise the issue that trial counsel was ineffective by failing to investigate substantial defenses available in a proper and timely manner.

3.) Appellate counsel was ineffective for failing to raise the issue that trial counsel was ineffective by failing to subpoena critical witnesses. Trial counsel informed petitioner of the importance of these witnesses but failed to submit any documentation or request for their appearance.

4.) Appellate counsel was ineffective for having failed to argue how trial counsel violated Petitioner's due process rights for failure to file his motion to sever trial of the 2013 rape charges from the trial of the other counts against petitioner.

5.) Appellate counsel was ineffective for having failed to argue that Petitioner was deprived of his constitutional and due process rights when being required to answer questions regarding case, before being afforded an attorney or offered a constitutional rights waiver.

(Doc. 1 at 10). However, only ground three was raised in state court. As is the case with claim one, the other four grounds of ineffective assistance of appellate counsel were never presented in state court.

Because Petitioner did not present claim one, or the four grounds under claim three, on direct appeal, Ohio's doctrine of *res judicata* now bars his ability to raise such claims in the state courts. *See State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967) (holding that claims must be raised on direct appeal, if possible, or they will be barred by the doctrine of *res judicata*); *see also State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982); *State v. Ishmail*, 423 N.E.2d 1068, 1070 (Ohio 1981). Ohio courts have consistently refused, in reliance on the doctrine of *res judicata*, to review the merits of procedurally barred claims. *See State v. Cole*, 443 N.E.2d at 170–71; *State v. Ishmail*, 423 N.E.2d at 1070. Further, the Sixth Circuit has held that Ohio's doctrine of *res judicata* is an independent and adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440

F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). Finally, with respect to the final *Maupin* factor, the independence prong, the Court concludes that Ohio's doctrine of *res judicata* in this context does not rely on or otherwise implicate federal law. Accordingly, the Court is satisfied from its own review of relevant case law that *res judicata* rule articulated in *Perry* is an adequate and independent ground for denying relief.

As explained, however, Petitioner may still secure review of these claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[,] ' . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule.'" *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Here, the Court notes that Petitioner's statement to police that underlies claim one was never introduced at trial, meaning actual prejudice cannot be present. (*see* Doc. 8–2, Tr. I, 11–12). Moreover, Petitioner has not argued, nor does the record reflect, that his procedural default of claim one and claim three can be excused by any explanation that would be sufficient under *Murray v. Carrier*. Thus, claim one and the four grounds under claim three are procedurally defaulted.

### B. Merits (Claims Two, Three, Four, and Five)

#### 1. Standard

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the familiar standards of the Antiterrorism and Effective Death Penalty Act ("AEDPA") govern Petitioner's remaining

claims. The United State Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*,--U.S.--, 134 S. Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted)).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Further, under AEDPA, the factual findings of the state court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light

of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013)

(citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)). The United States Court of Appeals

for the Sixth Circuit recently explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent
> if (1) "the state court arrives at a conclusion opposite to that
> reached by [the Supreme] Court on a question of law[,]" or (2) "the
> state court confronts facts that are materially indistinguishable
> from a relevant Supreme Court precedent and arrives" at a
> different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct.
> 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an
> "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it
> "identifies the correct governing legal rule from [the Supreme]
> Court's cases but unreasonably applies it to the facts of the
> particular . . . case" or either unreasonably extends or unreasonably
> refuses to extend a legal principle from Supreme Court precedent
> to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146
> L.Ed.2d 389.

*Coley*, 706 F.3d at 748–49. The burden of satisfying AEDPA's standards rests with the

petitioner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### 2. Application

#### i. Claim Two

Although unartfully pled, it appears that Petitioner asserts in claim two the same claim

that he raised in the state appellate court, *i.e.*, that the trial court improperly entered a judgment

of guilt against him on three counts that contained a life imprisonment specification because

there was insufficient evidence. The state appellate court denied this claim on the merits:

> W.J. asserts there was insufficient evidence to support his convictions. On appeal,
> W.J. does not challenge the sufficiency of the evidence with respect to the counts
> relating specifically to the events of September 6, 2013. Instead, W.J. alleges
> there was insufficient evidence to find him guilty of the three rape charges
> contained in Counts 1, 3, and 4 of the indictment, all alleged to have occurred
> when K.J. was less than 13 years old.

> {¶ 33} Whether there is legally sufficient evidence to sustain a verdict is a
> question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency

is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP–545, 2014–Ohio–1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006–Ohio–2417, ¶ 37.

{¶ 34} To convict a defendant of rape under R.C. 2907.02(A)(1)(b), the state is required to prove the defendant engaged in sexual conduct with the victim, who was not his spouse, and who was less than 13 years old. *State v. Rojas*, 10th Dist. No. 11AP–683, 2012–Ohio–1967, ¶ 9. As defined in R.C. 2907.01(A), "sexual conduct" means "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." The statute further provides that "[p]enetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶ 35} K.J. testified that she was 11 years old the first time her father had vaginal intercourse with her. She further testified that she was 11 years old the first time her father made her perform fellatio on him. K.J. then testified that there were repeated instances of W.J. putting his penis inside either K.J.'s vagina or mouth when she was 11 and 12 years old. A victim's testimony is sufficient evidence to support sexual conduct by vaginal intercourse or fellatio. *State v. Timmons*, 10th Dist. No. 13AP–1038, 2014–Ohio–3520, ¶ 23, citing *State v. Henderson*, 10th Dist. No. 10AP–1029, 2011–Ohio–4761, ¶ 17. Although W.J. argues the evidence is insufficient because no other witness testified that they knew of or suspected any sexual abuse by W.J. prior to the incident on September 6, 2013, such corroborating evidence is not required to prove the rape offense. *Id.*, citing *Henderson* at ¶ 17, citing *State v. Johnson*, 112 Ohio St.3d 210, 2006–Ohio–6404, ¶ 53 (noting "[c]orroboration of victim testimony in rape cases is not required").

{¶ 36} To the extent W.J. challenges K.J.'s credibility as a witness, we note that a review of the sufficiency of the evidence does not implicate an assessment of witness credibility. *State v. Bankston*, 10th Dist. No. 08AP–668, 2009–Ohio–754, ¶ 4 (stating that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility"). Accordingly, the state presented sufficient evidence of the offense of rape as contained in Counts 1, 3, and 4 of the indictment. We overrule W.J.'s [] assignment of error.

(Doc. 8-1, Ex. 18, *State v. W.J.*, 2015-Ohio-2353, ¶¶ 32–36).

In determining whether the evidence was sufficient to support a petitioner's conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution.

*Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson*, 443 U.S. at 326). "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* at 296–97 (quoting *Jackson*, 443 U.S. at 326).

Moreover, as previously noted, federal habeas courts must afford a "double layer" of deference to state court determinations of the sufficiency of the evidence. As explained in *Brown v. Konteh*, deference must be given, first, to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). Second, and even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.*; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This is a substantial hurdle for a habeas petitioner to overcome, and Petitioner has not done so here.

A reasonable juror easily could have inferred Petitioner's guilt of the crimes charges based on K.J.'s testimony that he raped her when she was eleven and twelve years old and the sexual assault nurse's findings of older injuries on K.J.'s hymen that healed with time. Moreover, as discussed, "[e]ven if a review of the evidence leads to the conclusion that no rational trier of fact could have found guilt beyond a reasonable doubt," this Court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable."

*Harris v. Morgan*, No. 1:10CV2351, 2011 WL 8184198, at *16 (N.D. Ohio Nov. 2, 2011) (citing *Durr v. Mitchell*, 847 F.3d 423, 449 (6th Cir. 2007); *White*, 602 F.3d at 710).  Applying this standard of review, Petitioner is not entitled to relief.

> ii.    Claim Three

In ground three of claim three (the only ground that was not procedurally defaulted), Petitioner asserts that his appellate counsel was ineffective for failing to raise the issue that trial counsel was ineffective by failing to subpoena critical witnesses.  (Doc. 1 at 10).  This Court assumes, as Respondent did, that Petitioner is referring to witnesses as to counts one, three, and four—which deal with the rape of Petitioner's daughter when she was less than thirteen years old—not counts six through ten, which Petitioner admitted to.  (*See* Doc. 8 at 55).

Petitioner raised ground three in his *pro se* Application to Reopen, albeit with limited detail.  (Doc. 8, Ex. 22 at 9–10).  The entirety of Petitioner's argument was that he "asked to have several people called as witnesses to support the historical nature of the relationship between his daughter and himself," but trial counsel failed to do so.  (*Id.*).  In its Memorandum Decision on Petitioner's Application to Reopen, the state appellate court elaborated on Petitioner's argument:

> W.J.'s first proposed assignment of error asserts that his trial counsel was ineffective in failing to 'provide or subpoena witnesses' to contradict the victim's testimony.  During the trial, the trial court inquired into W.J.'s expressed desire to fire his trial counsel.  W.J.'s trial counsel noted for the record that W.J. had asked him to call two of his other children to testify, but trial counsel advised W.J. that their testimony would have been duplicative to what was already presented at trial.  Additionally, W.J.'s trial counsel informed the trial court that he advised W.J. that calling more of his children to testify 'would leave a poor impression with the jury to allow the state to cross-examine his own children.'  (Tr. Vol. II, 222.)  W.J.'s attorney specifically stated he made the 'strategic decision' not to subpoena the other children to testify.  (Tr. Vol. II, 222.)

(Doc. 8, Ex. 24 at 3).

Ultimately, the appellate court held that [b]ecause W.J.'s trial counsel's decision not to subpoena W.J.'s other children to testify was a reasonable trial strategy, this alleged failure does not substantiate a claim of ineffective assistance of trial counsel." (*Id.*). Thus, the court found that even if W.J.'s appellate counsel—which was himself—had raised this argument during the direct appeal, "it would not have been supported by the record." (*Id.*).

The United States Supreme Court set forth the legal principals governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a petitioner claiming ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. 466 U.S. at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir. 2013). Establishing deficient performance by counsel "requires a showing that 'that counsel's representation fell below an objective standard of reasonableness.'" *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (quoting *Strickland*, 466 U.S. at 688). To make such a showing, a petitioner "must overcome the 'strong [ ] presum[ption]' that his counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Hale*, 512 F. App'x at 520 (quoting *Strickland*, 466 U.S. at 687). "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The Court observed that while "'[s]urmounting *Strickland*'s high bar is never . . . easy[,]' . . . [e]stablishing that a state court's

application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) and citing *Strickland*, 466 U.S. at 689). The Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Here, as the appellate court noted, Petitioner's counsel specifically articulated that he believed the information the witnesses were going to provide was not "going to be relevant information or particularly helpful." (Doc. 8-4, Tr. Vol. II , 222–23). Trial transcripts indicate that Petitioner hoped the witness could testify that there were no indications or records indicating that there was no abuse between Petitioner and his daughter prior to September 6, 2013. (*Id.*, Tr. Vol. II, 227). However, as Petitioner's trial counsel addressed, and the trial court acknowledged, no one had testified "that during this period of time there were any complaints with respect to alleged contact between [Petitioner] and [his] daughter." (*Id.*).

Thus, that state appellate court did not unreasonably hold that under the *Strickland* standard, Petitioner cannot overcome the presumption that "the challenged action 'might be considered sound trial strategy.'" *Rodriguez v. Warden, S. Ohio Corr. Facility*, 940 F. Supp. 2d 704, 713 (S.D. Ohio 2013) (quoting *Strickland*, 466 U.S. at 689).

### iii.    Claims Four and Five

In claims four and five, Petitioner argues that the trial court abused its discretion in not granting a mistrial after evidence of prior bad acts were introduced that unfairly prejudiced him

(claim four) and his confrontation clause right was violated (claim five). The state appellate court collectively addressed these assigned errors and found the trial court did not abuse its discretion in denying both of Petitioner's motions for mistrial. (Doc. 8-1, Ex. 18, *State v. W.J.*, 2015-Ohio-2353, ¶¶ 45–53).

It is within a trial judge's sound discretion to grant a mistrial when, in her opinion, there is a "manifest necessity" for doing so. *Walls v. Konteh*, 490 F.3d 432, 436 (6th Cir. 2007); *Grier v. Richland Country Corr. Inst., Warden*, No. 5:12CV0257, 2012 WL 5271721, at *14 (N.D. Ohio Sept. 20, 2012). Refusing to declare a mistrial thus violates fundamental fairness only when the court abuses its "broad discretion" in such matters. *Grier v. Richland Country Corr. Inst., Warden*, No. 5:12CV0257, 2012 WL 5271721, at *3 (N.D. Ohio Sept. 20, 2012) (citing *Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1863, 176 L.Ed.2d 678 (2010)).

As for the asserted bad acts testimony, on cross-examination Petitioner's counsel asked K.J., Petitioner's daughter, about Petitioner's place of employment and conflicts that he had with her mother.

> Q: Okay. Did you ever hear your dad talk about an opportunity to go to Japan—
> A: Yes.
> Q: —as part of his job?
> A: Yes, sir.
> Q: Okay. What did he—let me rephrase that. Did he talk about it with your mom?
> A: Yes, sir.
> Q: And your mom didn't want him to go, did she?
> A: She didn't say she didn't want him to go, but she was, like—she didn't think that he could go.
> Q: Okay. If he had gone to Japan for work, would you guys have gone with him or stayed here?
> A: We would have stayed here.
> Q: And you said your mom wasn't mad at him for wanting to go to Japan, but she didn't think he'd be able to?
> A: Yeah, because he's been in legal trouble before, and I think he's, like, been to prison already like twice, so she was, like, "You can't leave the country."

(Doc. 8-1, Ex. 18, *State v. W.J.*, 2015-Ohio-2353, ¶ 50). Petitioner's counsel did not immediately object, but after K.J. completed her testimony he requested a mistrial based on K.J.'s statement regarding Petitioner's prison time. *Id.* The trial court denied the request for a mistrial, but offered to provide a curative instruction if defense counsel so requested. *Id.* However, there is no evidence such a request was ever made. *Id.* The state appellate court, relying on the fact that Petitioner's counsel elicited the testimony himself, that K.J's testimony was vague and did not reference any specific crime, and the "ample evidence" against Petitioner for the crimes in question, found that Petitioner was not so prejudiced by K.J's statement that a mistrial was warranted. *Id.* at ¶ 51–52.

A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). Instead, "federal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)). Only where the error resulted in the denial of fundamental fairness will habeas relief be granted. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). For the reasons the state appellate court explained, such are not the circumstances here. K.J.'s one-time comment in response to questioning from Petitioner's counsel was not so prejudicial to rise to a denial of fundamental fairness. This is especially true in light of the fact that Petitioner's counsel chose not to seek a curative instruction. Accordingly, claim four fails to present an issue of federal constitutional magnitude warranting habeas relief.

Turning to the alleged confrontation clause violation, Petitioner argues that the trial court abused its discretion when it failed to grant a mistrial after his "right to be confronted with the witness against him was violated." (Doc. 1 at 13). Although Petitioner doesn't explicitly state

who he is referring to, this Court assumes Petitioner's argument is based on T.G.'s testimony during which she refused to answer certain questions based on her Fifth Amendment rights and alleged memory issues from a traumatic brain injury. (Doc. 8-2, Tr. Vol. I, 28–37). The state appellate court noted that "the questions T.G. refused to answer related to her ability to remember the events of September 6, 2013," but because Petitioner "admitted his guilt both at trial and on appeal to the counts in the indictment relating to the events of September 6, 2013," he could not demonstrate prejudice from any potential Confrontation Clause violation. (Doc. 8-1, Ex. 18, *State v. W.J.*, 2015-Ohio-2353, ¶ 48).

Assuming, *arguendo*, that the alleged confrontation clause issue is cognizable in this case, "[c]onfrontation clause errors are subject to harmless-error analysis." *Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir. 2007) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Chapman v. California*, 386 U.S. 18, 21–22 (1967)). The Supreme Court has articulated a five-factor test for courts to utilize in determining whether a confrontation clause error is harmless:

> These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684 (citations omitted).

As the state appellate court noted, Petitioner admitted to the events of September 6, 2013, making T.G.'s testimony cumulative to Petitioner's admission and further minimizing the importance of her testimony. This, coupled with the overwhelming physical and testimonial evidence of Petitioner's guilt, weigh in favor of harmless error, as the state court correctly held.

Consequently, Petitioner has failed to show that trial court's failure to declare a mistrial—based on prior bad acts being introduced through testimony and an alleged confrontation clause error—was an abuse of discretion.

## III. RECOMMENDED DISPOSITION

For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## Procedure on Objections

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen days after being served with a copy thereof. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) ("[F]ailure to object to the magistrate judge's recommendations constituted a waiver of [the] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of

contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted).  The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

IT IS SO ORDERED.


Date:   October 4, 2017                          /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE